IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| FARM BUREAU PROPERTY & CASUALTY INSURANCE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> DAVID SPARKS; DIESEL POWER GEAR, LLC; DIESELSELLERZ.COM, LLC; DIESEL DAVE ENTERTAINMENT, INC.; TIMOTHY CALEB PERKINS; and MELISSA LUNSFORD, individually and on behalf of R.L., <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** <br><br> Case No. 1:20-cv-00044-JNP-JCB <br><br> District Judge Jill N. Parrish <br><br> Magistrate Judge Jared C. Bennett |

This declaratory judgment action raises questions regarding insurance coverage for an ATV accident involving an ATV provided by David Sparks ("Sparks") that injured a child. Plaintiff Farm Bureau Property & Casualty Insurance Company ("Farm Bureau"), which purportedly insured the ATV in question, sued Sparks, several of Sparks' businesses, Timothy Caleb Perkins ("Perkins") and Melissa Lunsford ("Lunsford") (collectively, "Defendants"), alleging generally that there was no coverage for the accident. The case comes before the court on cross-motions for summary judgment filed by each of the parties. *See* ECF Nos. 66 (filed by Lunsford), 69 (filed by Farm Bureau), 70 (filed by Perkins), 73 (filed by Diesel Dave Entertainment, Diesel Power Gear, LLC, DieselSellerz.com, and Sparks). For the following reasons the court DENIES summary judgment for all parties.

## FACTUAL BACKGROUND

Farm Bureau is an Iowa corporation with its principal place of business in West Des Moines, Iowa. Farm Bureau writes insurance in eight states, including Utah.

Lunsford is the mother and guardian of the child injured in the accident. Sparks is an entrepreneur who owns and operates a number of businesses primarily related to trucks. Sparks' businesses include three entities named as defendants in this lawsuit: Diesel Power Gear, LLC, DieselSellerz.com, LLC dba DieselSellerz, and Diesel Dave Entertainment, Inc. Perkins is the chief operating officer for Diesel Power Gear, LLC. Relevant to this lawsuit, Sparks also owns B&W Auto dba Sparks Motors.

In addition to owning several businesses, Sparks is a social media influencer. Sparks receives a monthly salary from the Diesel businesses and a talent fee from Discovery Channel for his involvement in the show, Diesel Brothers. Sparks uses his Instagram, Facebook, and YouTube pages to promote different products, sometimes related to his businesses.

Around January 17, 2018, Polaris Industries, Inc. ("Polaris") sent a 2018 Polaris Ranger XP (the "Ranger") to either Sparks or one of his businesses, B&W Auto dba Sparks Motors. Sparks claims that Polaris gave him the Ranger personally as compensation for marketing Polaris products. Farm Bureau insists that Polaris sent the Ranger to B&W Auto, not Sparks.

Soon after Sparks came into possession of the Ranger, he began to investigate insurance for the vehicle. Sparks approached Cody Beus ("Beus"), a captive agent for Farm Bureau, to discuss coverage for the Ranger as well as a number of other recreational vehicles. Beus visited the hangar where Sparks kept his personal recreational vehicles and took pictures of the vehicles. Beus also inquired as to whether Sparks had title and registration for the vehicles. Sparks replied that he did not. Beus was nevertheless convinced, based on the MSO (Manufacturer's Statement

2

of Origin aka Manufacturer's Certificate of Origin) that Sparks produced, that Sparks satisfied the requirement of having owned the Ranger. Beus therefore wrote an insurance policy covering the Ranger and other vehicles. Farm Bureau ultimately issued the policy and Sparks began paying premiums.

The liability policy (the "Policy") issued by Farm Bureau on Sparks' Ranger and other recreational vehicles contained a $500,000 each occurrence bodily injury limit. The Policy period originally extended from May 30, 2019 to May 30, 2020. But Farm Bureau canceled the Policy on July 31, 2019—effective August 30, 2019—due to "the missing signature page accepting coverage and missing documents supporting ownership of vehicles." ECF No. 66-2 at 43. Ultimately, the Policy was in force from May 30, 2019 to August 30, 2019.

The accident giving rise to this lawsuit occurred on July 11, 2019 in Moab, Utah ("the Lunsford Incident"). Sparks lent the Ranger to Perkins for use at a boys outing sponsored by the Church of Jesus Christ of Latter-day Saints. Perkins drove the vehicle at the outing with one of the youth, R.L., in the passenger seat. Perkins lost control of the Ranger, causing it to overturn on the passenger side. R.L.'s legs were ejected from the Ranger's cab and pinned beneath the vehicle. R.L. suffered serious injuries that required extensive medical treatment.

Initially, both Perkins and Sparks believed that insurance for the Church of Jesus Christ of Latter-day Saints would cover losses related to the accident. At some point between the accident and the end of September 2019, Sparks contacted Beus to tell him about the Lunsford Incident and to ask him if there was insurance covering the Ranger. Sparks did not inform Beus that he intended to file a claim and Beus did not inform Farm Bureau of the Lunsford Incident.

On January 28, 2020, Lunsford filed a lawsuit on behalf of R.L in Utah state court (the "Underlying Lawsuit"). The Underlying Lawsuit alleged that the vehicle involved in the accident

was owned and/or controlled by Sparks and his companies and alleged the following causes of action: negligence, respondeat superior liability, and loss of filial consortium. The Underlying Lawsuit named Sparks, his businesses, Perkins, and Doe Defendants 1-10. Farm Bureau was not a party to the Underlying Lawsuit.

Farm Bureau filed this declaratory judgment action on April 24, 2020. The action seeks a declaration (1) that there is no coverage for the damages arising out of the use of the vehicle involved in the accident, (2) that there is no coverage under the Policy for DieselSellerz.com, Diesel Power Gear, LLC, or Perkins, and (3) that there is no coverage for Sparks under the Policy because of his failure to cooperate as required by the terms of the Policy. ECF No. 2 at 12.

Both Farm Bureau and Lunsford moved for summary judgment on all three claims. The other defendants filed motions for summary judgment joining in Lunsford's arguments.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted).

"At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d

1513, 1518 (10th Cir. 1994). Instead, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

The legal standard does not change if the parties file cross-motions for summary judgment. Each party bears the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000); *see also Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

## ANALYSIS

Farm Bureau asserts that it is entitled to summary judgment because Sparks was not the legal owner of the Ranger at the time of the Lunsford Incident. Defendants respond that (1) Sparks had an insurable interest in the Ranger, (2) Sparks was the owner of the Ranger under the Policy terms, and (3) the Policy was in effect at the time of the Lunsford Incident and no Policy exclusions apply.

In their own motions for summary judgment, Defendants contend that (1) Sparks owned the Ranger at the time of the Lunsford Incident, (2) Sparks had an insurable interest in the Ranger, (3) Sparks gave Perkins permission to use the Ranger,[1] and (4) no exclusions or restrictions apply to defeat coverage.

---

[1] Farm Bureau does not dispute that Sparks granted Perkins permission to use the Ranger. Rather, Farm Bureau argues that Sparks' permission to Perkins is irrelevant because Sparks did not own the vehicle and therefore the Ranger is not covered for any driver under the Policy. Because Farm Bureau does not dispute the fact, the court assumes that Sparks gave Perkins permission to use the Ranger and focuses its inquiry instead on whether Sparks qualified as an "owner" under the Policy terms.

The issues of whether Sparks had an insurable interest in the Ranger and whether Sparks "owned" the Ranger under the terms of the Policy at the time of the Lunsford Incident are critical to resolving all of the summary judgment motions before the court. Accordingly, the court begins by considering Sparks' purported insurable interest. It then parses the ownership requirement in the Policy. Finally, the court addresses two additional arguments raised by Defendants regarding lack of recission and Farm Bureau's acceptance of policy premiums.

## I.     INSURABLE INTEREST

### A.     *Insurable Interest Requirement*

It is axiomatic that an insurable interest is required for a valid insurance contract. *See* 3 COUCH ON INSURANCE § 41:1 ("In the absence of an insurable interest, an insurance contract is regarded as a void and unenforceable wagering contract."); 44 AM. JUR. 2d *Insurance* § 933 (2022) ("[A] valid contract of insurance requires an insurable interest."). The insurable interest requirement is intended to prevent gambling, protect against waste, and preclude persons from intentionally destroying lives or property in order to receive insurance benefits. *See Gossett v. Farmers Ins. Co. of Wash.*, 948 P.2d 1264, 968-69 (Wash. 1997) (citing Robert E. Keeton & Alan I. Widiss, *Insurance Law, A Guide to Fundamental Principles, Legal Doctrines, and Commercial Practices, Practitioner's Edition* § 3.1(a) at 136-38 (1988)).

The Utah Legislature similarly requires insurance contracts to be based upon an insurable interest. Utah law provides that "[a]n insurer may not knowingly provide insurance to a person who does not have or expect to have an insurable interest in the subject of the insurance" and "[a] person may not knowingly procure, directly, by assignment, or otherwise, an interest in the proceeds of an insurance policy unless that person has or expects to have an insurable interest in the subject of the insurance." UTAH CODE § 31A-21-104(2)(a)-(b).

The Policy provisions here align with the black-letter law discussed above. The Policy states that Farm Bureau "will not pay for any loss to property in which you or any 'insured' do not have an insurable interest at the time of loss." ECF No. 69-9 at 20. In other words, an insurable interest is a baseline requirement for Farm Bureau to cover a claim under the Policy.

### B.   *Sparks Had an Insurable Interest in the Ranger*

Under Utah law, "a person has an insurable interest in property whenever he would profit by or gain some advantage by its continued existence and suffer some loss or disadvantage by its destruction." *Hill v. Safeco Ins. Co.*, 448 P.2d 915, 916 n.2 (Utah 1969). Insurable interest and ownership are separate concepts. For purposes of establishing insurable interest, "it is immaterial whether [the insured] has, or has not, any title in or lien upon, or possession of, the property itself" as long as "[the insured] would sustain such loss." [2] *Id.* Indeed, "[a]ny interest in property, legal or equitable, qualified, conditional, contingent, or absolute, or merely the right to use the property, with or without the payment of rent, is sufficient" to establish an insurable interest in property. *Id.*

Defendants argue that Sparks held an insurable interest in the Ranger at the time of the accident for four reasons: (1) Sparks would profit or gain some advantage by the Ranger's continued existence, (2) Sparks would suffer some loss or disadvantage by the Ranger's destruction, (3) Sparks had a legal or equitable interest in the Ranger, and (4) Sparks had a right to use the Ranger.

The court agrees. To begin, the mere right to use the property alone is sufficient to establish an insurable interest. 3 COUCH ON INSURANCE § 41.11 ("Even a mere right to use property is

---

[2] While ownership is not necessary to establish an insurable interest, if Defendants are able to establish that Sparks owns the Ranger, then that, in and of itself, would establish an insurable interest in the Ranger. *See* 3 COUCH ON INSURANCE § 41:13 ("Any status of ownership or possession, provided that the insured has a cognizable economic interest in the property, will support a finding of insurable interest.").

insurable, and the lack of an obligation to pay rent is inconsequential to the property's insurability."). Sparks provides copious evidence that he retained the right to use the Ranger. Sparks and his wife used the Ranger for family camping trips prior to the Lunsford Incident. Sparks and his wife did not need to ask permission before using the Ranger. Nor did Sparks need to ask permission before lending the vehicle to friends. The couple also kept the Ranger in their home garage or personal hangar and continue to keep the Ranger at one of those sites up to the present.

Farm Bureau essentially concedes Defendants' first two points. Farm Bureau admits that "[s]urely David and Ashley Spark [sic] had an interest in the continued existence of the Ranger and would likely be disadvantaged by its destruction." ECF No. 76 at 27. But Farm Bureau argues that this "does not rise to the level of an 'insurable interest' because the Ranger was not owned by either of them at the time of the Accident but was instead an asset of one of David Sparks' businesses." *Id.* at 27-28. Farm Bureau misunderstands the law. Ownership is not required to establish an insurable interest. *See* 44 AM. JUR. 2d *Insurance* § 999 (2022) ("The lack of title does not prevent a person from having an insurable interest for the purpose of obtaining liability insurance."). Accordingly, the court finds that Sparks had an insurable interest in the Ranger.[3]

## II.   POLICY LANGUAGE

Even if Sparks had an insurable interest in the Ranger, the court must still consider whether the language of the Policy specifically excluded the Ranger from coverage. Defendants contend Farm Bureau cannot exclude coverage if Sparks has an insurable interest. But Defendants

---

[3] Farm Bureau further argues that, even if Sparks can establish an insurable interest, the insurable interest has no value. But the value of Sparks' insurable interest is a disputed fact and is bound up in the question of ownership and coverage. If Sparks can establish ownership, he undoubtedly has an insurable interest in the Ranger with monetary value. Because ownership is also required under the Policy, the court need not delve into the value of Sparks' insurable interest if he did not own the Ranger.

misunderstand the terms of the Policy. While an insurable interest is *necessary* to gain coverage under a policy, it is not necessarily *sufficient* to prevail on a coverage claim. *See Indem. Ins. Co. of N. Am. v. Talbot-BHJ Ins., Inc.*, No. 04-CV-23-B, 2005 WL 8155483, at *7 (D. Wyo. Mar. 31, 2005) ("[A]n insurable interest does not create coverage.").

Indeed, the caselaw cited by Defendants supports this position. Defendants rely heavily on *Manner v. Schiermeier*, 393 S.W.3d 58 (Mo. 2013), a Missouri Supreme Court decision regarding underinsured motorist coverage, for the proposition that an insured who has an insurable interest is entitled to coverage despite the fact the insured does not have title to the vehicle. *Manner* involved a young man, Nathaniel Manner, who suffered extensive injuries while riding a motorcycle hit by a vehicle driven by Nicholas Schiermeier. *Id.* at 60. In addition to suing Schiermeier, Nathanial sought additional recovery for his injuries under the uninsured motorist coverage endorsement contained in several policies he held for other vehicles. *Id.* The policies in question included an "owned-vehicle exclusion," which stated that: "This coverage does not apply for bodily injury to a person while occupying, or when struck by, a motor vehicle that is not insured under this policy if it is owned by you or any resident of your household." *Id.* at 61. The insurers argued that "the facts that [Nathaniel] had an insurable interest and possession of the motorcycle unambiguously showed that he 'owned' the vehicle as that term is used in the policy." *Id.* at 60. Nathaniel countered that the owned-vehicle exclusion did not apply because "[t]he insurers chose not to define the term 'owned' in the policies" and thus "[a]ny ambiguity in the meaning of 'owned' vehicle must be construed against the insurer," thus requiring coverage. *Id.*[4]

---

[4] *Manner* arises from a different posture than this case. In *Manner*, the insurers wanted to demonstrate that Nathaniel Manner "owned" the vehicle such that the owned-vehicle exclusion applied to exclude coverage of Nathaniel's motorcycle accident. Here, the insurer wants to demonstrate that Sparks did *not* "own" the vehicle in order to exclude coverage for the Ranger accident. In other words, the owned-vehicle exclusion in *Manner* differed from this case. In

The court found coverage because the insurer failed to meet its burden of showing that the owned-vehicle exclusion applied. *Id.* at 60. Because Nathaniel's uncle retained title and still was receiving payments from Nathaniel at the time of the accident, the court determined that Nathaniel did not "own" the vehicle as required by the owned-vehicle exception. *Id.* Specifically, the *Manner* court held that the insured's "insurable interest" in the vehicle did not qualify him as an "owner" under the policy. *Id.* Accordingly, the *Manner* court explicitly *rejects* the notion that insurable interest is equivalent to ownership. *See id.* at 63 ("No case or dictionary has been identified that defines 'ownership' and 'possession of an insurable interest' as equivalences."); *id.* at 62 ("Insurers cite no authority for their proposition that an insurable interest is equivalent to ownership, and this Court has found none.").

Similarly, the Policy at issue here requires both an insurable interest *and* ownership of the property. Defendants argue that this creates a situation where "two or more contract provisions, when read together, give rise to different or inconsistent meanings." ECF No. 81 at 18 (citation omitted). Because of the purported inconsistency, Defendants contend that the court must construe the Policy in favor of the insured. *See U.S. Fid. & Guar. Co. v. Sandt*, 854 P.2d 519, 521 (Utah 1993). But the court sees no inconsistency. Farm Bureau is not required to cover every individual who has an insurable interest in a piece of property. Farm Bureau can place limitations on who it will cover under a Policy. *Cyprus Plateau Min. Corp. v. Commonwealth Ins. Co.*, 972 F. Supp. 1379, 1382 (D. Utah 1997) ("It is equally well settled . . . that insurance companies have the right to limit coverage in any manner they desire, so long as the limits do not conflict with statutory prohibitions or public policy." (citing *Farmers Ins. Exch. v. Call*, 712 P.2d 231, 233 (Utah 1985))).

---

*Manner*, it excluded coverage of accidents where the injured person occupied a vehicle owned by the insured. Here, the owned-vehicle exclusion requires that a vehicle be owned by the insured in order to find coverage.

10

In other words, the insurable interest requirement is simply a minimum requirement for coverage. The Policy's ownership requirement further narrows the Policy's coverage. Accordingly, Defendants must establish both that Sparks had an insurable interest in the Ranger *and* that Sparks owned the Ranger at the time of the Lunsford Incident. The court thus addresses whether the Ranger qualifies as an "owned" vehicle under the Policy.

### A.    Ownership

The court first considers how to construe the term "owned" under the Policy, then turns to the question of whether either party has submitted sufficient evidence to establish that there is no genuine issue of material fact as to ownership of the Ranger. The court concludes that neither party has met that burden.

### i.    Definition of "Owned"

An insurance policy is a contract between the parties and is construed by employing the general rules of contract interpretation. *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993). Where the language of the policy is clear and unambiguous, the agreement should be enforced as written. *See St. Paul Fire & Marine Ins. v. Com. Union Assurance*, 606 P.2d 1206, 1208 (Utah 1980). "On the other hand, when a policy provision is ambiguous, extrinsic evidence is admissible to help 'resolve the ambiguity.'" *Headwaters Res., Inc. v. Ill. Union Ins. Co.*, 770 F.3d 885, 892 (10th Cir. 2014) (quoting *Fire Ins. Exch. v. Oltmanns*, 285 P.3d 802, 805 (Utah Ct. App. 2012)). And where an ambiguity remains after applying the rules of construction, the ambiguous provision should be construed against the insurer and in favor of the insured. *Alf*, 850 P.2d at 1274.

11

Here, the Policy provides coverage for vehicles "owned" by the insured.[5] The Policy defines "owned" as "[a] vehicle 'owned' by you or leased by you under a written agreement for a continuous period of at least six months." ECF No. 69-9 at 25. In essence, the Policy defines "owned" as "a vehicle owned by you." Such a circular definition of ownership is inherently ambiguous and provides the court no guidance as to how to determine ownership. Accordingly, the court will consider extrinsic evidence, in addition to the Policy language as a whole, to ascertain the meaning of "owned."

Farm Bureau urges the court to define ownership as holding title and registration. But the plain language of the Policy simply contains no such requirement. Moreover, the Policy's definition of "non-owned vehicle" suggests a distinction between ownership and registration. Specifically, the Policy defines a non-owned vehicle as a "'personal vehicle' that is not: '[o]wned by; [r]egistered in the name of; or [f]urnished or available for the regular or frequent use of, you or any resident of your household." ECF No. 69-9 at 40. The disjunctive "or" between "owned by" and "registered in the name of" suggests a distinction between ownership and registration. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) (recognizing that "the ordinary use [of 'or'] is almost always disjunctive, that is, the words it connects are to be given separate meanings" (citation omitted)).

Perhaps in recognition of that fact, Farm Bureau looks to the Utah Code to find a definition of "owned" or "owner." Farm Bureau first cites to Utah Code § 41-12a-103(8).[6] But as Farm

---

[5] The Policy also excludes coverage for "vehicles which are not 'your personal vehicles' that are owned by you or furnished or available for your regular or frequent use." ECF No. 66-9 at 31.

[6] Utah Code § 41-12a-103(4)(a) and (8) defines an "owner" of a vehicle "designed for use upon a highway" as "a person who holds legal title to a motor vehicle," "a lessee in possession," "a conditional vendee or lessee if a motor vehicle is the subject of a conditional sale or lease with the right of purchase upon performance of the conditions stated in the agreement and with an

Bureau later concedes, that section does not apply to off-highway vehicles. *See* ECF No. 82 at 8. Farm Bureau also turns to Utah Code § 41-22-2(18), which defines an "[o]wner" to be "a person, other than a person with a security interest, having a property interest or title to an off-highway vehicle and entitled to the use and possession of that vehicle." But even this definition does not rely exclusively on title to establish ownership. Indeed, it defines an "owner" as someone with "a property interest *or* title" in an off-highway vehicle.

And Farm Bureau's course of conduct at the time of contracting suggests that title and registration were not required. Farm Bureau's agent, Beus, requested title and registration on the vehicles to be covered by the Policy. After Sparks told Beus that he did not have title and registration—only MSOs—Farm Bureau issued the Policy anyway. Indeed, Beus testified that Farm Bureau has never asked for title and registration for any of the policies he sold.

Accordingly, while "owned" under the Policy *could* refer to a requirement that the insured hold title to the vehicle, because of the ambiguity inherent in the Policy the court construes the Policy against Farm Bureau and declines to adopt such a narrow definition of "owned." Instead, the court adopts a definition that favors coverage. 43 AM. JUR. 2d *Insurance* § 290 (2022) ("Once an ambiguity is established by policy language that reasonably may be interpreted more than one way, a court will apply the reasonable interpretation that favors coverage."). Utah law defines ownership as someone with a property interest in or title to property. This definition aligns with the case cited by Defendants, which holds that ownership "usually involves establishing either title or the power to 'voluntarily destroy, encumber, sell, or otherwise dispose' of the property." *Manner v. Schiermeier*, 393 S.W.3d 58, 63 (Mo. 2013) (citations omitted); *see also Phillips v. Wash. Legal*

---

immediate right of possession in the conditional vendee or lessee," or "a mortgagor if a motor vehicle is the subject of a mortgage with the mortgagor entitled to possession."

*Found.*, 524 U.S. 156, 167 (1998) (referencing "the fundamental maxim of property law that the owner of a property interest may dispose of all or part of that interest as he sees fit"). Because the parties both agree that Sparks did not have title to the Ranger at the time of the accident, the key question becomes whether Sparks legally had a property interest in the Ranger at the time of the accident. The court thus looks to the certificates of origin as evidence relevant to resolving that question.[7]

### ii.    Evidence of Ownership

If either side can establish who was in possession of the valid certificate of origin on the date of the accident, that may suffice to demonstrate ownership. *See United States v. Tucker*, 745 F.3d 1054, 1057 (10th Cir. 2014) ("Manufacturers Statements of Origin ("MSO's") . . . are industry-standard documents listing each vehicle's manufacturing history, make, model, and vehicle identification number. MSO's list the dealership as the owner of the vehicle until it is sold and the dealership issues a title to the purchaser."); *see also In re Durham*, No. 00-12216C-7G, 2003 WL 21459555, at *3 (M.D.N.C. June 23, 2003) ("Debtors received a certificate of origin rather than a certificate of title. This difference did not prevent the Debtors from acquiring ownership of the Dodge truck. The initial ownership of a new vehicle such as the Dodge truck involved in this case is evidenced by a certificate of origin rather than a certificate of title."). But each side submits a distinctly different view as to what the certificates of origin reveal about the ownership of the Ranger.

---

[7] In his deposition, Sparks testified several times that he had the sole power to sell the Ranger. Whether this testimony is accurate may depend on the status of the MSOs. If the Ranger belonged to B&W Auto at the time of the accident, Sparks testimony that he could have sold it without the permission of B&W Auto is simply inaccurate. If, on the other hand, the Ranger belonged to Sparks at the time of the accident, he certainly could establish ownership under this definition. Accordingly, the court declines to rely solely on Sparks' testimony regarding his power to sell the Ranger and therefore also considers the underlying legal documents.

Farm Bureau claims that B&W Auto owned the Ranger. As evidence, Farm Bureau submits a certificate of origin listing "B&W Auto LLC dba Sparks Motors" (the "B&W Certificate") as the recipient of the vehicle from Polaris. Farm Bureau also submits a declaration from a Polaris employee indicating that the certificate of origin "correctly indicates that B&W Auto LLC DBA Sparks Motors was the receiving party of the Polaris Ranger." ECF No. 69-3 at 3. Farm Bureau further points out that Sparks submitted the B&W Certificate when he titled and registered the vehicle in April 2020.

Defendants, on the other hand, allege that Sparks owned the Ranger. As evidence, they point to a different certificate of origin showing that Polaris transferred the vehicle to Sparks (the "Sparks Certificate"). ECF No. 74-3 at 1. The Sparks Certificate is nearly identical to the B&W Certificate—down to the Bates stamp number in the lower left-hand corner and the handwritten #729 in the upper right-hand corner. The only difference is that the Sparks Certificate lists Dave Sparks, not B&W Auto, as the transferee from Polaris. As further evidence of ownership, Defendants point to the fact that Sparks ultimately obtained title and registration for the Ranger in April 2020. Defendants claim that obtaining title and registration would be impossible if Sparks were not the true owner.

The evidence presented clearly raises a disputed issue of material fact. Indeed, the evidence could support several scenarios. In favor of Defendants' position, perhaps Polaris inadvertently— because of the many dealings between Polaris, Sparks, and Sparks' companies—issued a certificate of origin listing B&W Auto as the recipient. And once Sparks realized the error, Sparks either (1) contacted Polaris to request a new certificate of origin that reflected the proper owner or (2) had B&W Auto transfer the vehicle to Sparks. The evidence could support either possibility. Sparks clearly has a certificate of origin that lists himself as the recipient from Polaris. The Sparks

Certificate supports the first possibility—that Polaris reissued a corrected certificate of origin after Sparks discovered the error. Indeed, Sparks testified that he had to go back to Polaris to request new MSOs "all the time." ECF No. 66-2 at 5. Or, perhaps B&W Auto immediately transferred ownership of the Ranger to Sparks once the error was uncovered. The B&W Certificate contains an assignment form on the rear in which Sparks Motors (i.e., B&W Auto) assigns the vehicle to Sparks. The assignment is undated, so it could have occurred prior to the accident. There is some evidence to support this theory. The Vehicle Application for Utah Title, although submitted in April 2020, lists January 29, 2018 as the date of transfer from Jim Anderson (a B&W Auto employee) to David Sparks. ECF No. 69-4 at 6. This evidence supports the second possibility—that B&W Auto transferred ownership of the Ranger to Sparks as soon as the parties realized that Polaris had issued the certificate of origin to the wrong entity. And it is also conceivable that Sparks, in an effort to cover himself, did both of the above—obtained a certificate of origin from Polaris *and* had B&W Auto assign its ownership interest to Sparks. Any of the possibilities discussed in this paragraph support the conclusion that Sparks obtained ownership of the vehicle well before the Lunsford Incident.

However, a very different scenario—one that supports Farm Bureau's position—is also possible. Perhaps both parties agreed for Polaris to transfer the vehicle to B&W Auto. Polaris did so and issued the B&W Certificate. Only once Farm Bureau began asking for title and registration did Sparks approach the DMV to have the Ranger titled and registered in his name. And perhaps at that time—in April 2020—B&W Auto assigned the vehicle to Sparks. As noted above, because the assignment is undated, it could have occurred in April 2020.

The evidence presented does not foreclose any of these possible scenarios. If the first scenario is accurate, then why did Sparks provide the B&W Certificate (assigned to himself) to

the DMV instead of simply submitting the Sparks Certificate? Conversely, the second scenario fails to explain the existence of the second certificate of origin listing Sparks as the transferee. Weighing such conflicting evidence is not the role of the court on summary judgment. *See Houghton v. Foremost Fin. Servs. Corp.*, 724 F.2d 112, 114 (10th Cir. 1983) ("Summary judgment should not be granted when different inferences can be drawn from conflicting evidence."). Therefore, a genuine issue of fact remains as to whether Sparks owned the vehicle at the time of the accident.

Moreover, the viability of each side's public policy arguments depends on which of the aforementioned possibilities the trier of fact elects to believe. Farm Bureau argues that finding coverage contravenes public policy because it would effectively permit business owners to circumvent higher premiums associated with commercial and business insurance policies by merely placing company vehicles on personal insurance policies. *See* ECF No. 69 at 27. On the other hand, Defendants argue that permitting an insurance company to collect premiums and later deny coverage (or an insurable interest) also violates public policy. ECF No. 66 at 31. Farm Bureau's public policy argument is inapposite if Sparks personally owned the vehicle on the date of the accident. And Defendants' public policy argument holds little force if Sparks misrepresented his ownership status in applying for a policy to cover the Ranger. Because the public policy arguments are bound up in how the trier of fact resolves the issue of ownership, neither argument is persuasive at this juncture.

In sum, the court finds that there is a genuine issue of material fact as to whether Sparks owned the vehicle at the time of the Lunsford Incident. This alone precludes summary judgment in favor of Sparks. But to determine how the court should rule on Farm Bureau's motion, it must also consider whether any coverage exceptions apply. Even if Sparks owned the Ranger when the

accident occurred, Farm Bureau would not be required to provide coverage if a coverage exception applies. Accordingly, the court turns next to the issue of coverage exceptions.

### B.   Policy Exclusions and Requirements

Farm Bureau cites to two different policy exclusions that it argues apply to preclude coverage here: (1) the vehicle business exclusion and (2) the non-owned vehicle exclusion. Farm Bureau also asserts that Sparks failed to provide Farm Bureau notice of the claim as required by the Policy. Because the court determines that none of the referenced policy exclusions or restrictions preclude coverage, summary judgment for Farm Bureau is not appropriate.

### i.   Vehicle Business Exclusion

The Policy defines a "vehicle business" as "[a] business or job where the purpose is to sell, lease, repair, service, transport, store or park vehicles or 'trailers.'" ECF No. 66-10 at 5. The Policy provides that "[t]here is no coverage for any 'damages' 'arising out of' any vehicle being repaired, serviced, or used by any 'person' employed or engaged in any way in a 'vehicle business.'" ECF No. 66-10 at 6. This exclusion "does not apply to you [the insured], your agent, employee or partner or any 'household member.'" *Id.*

Sparks is a social media influencer who endorses and advertises Polaris products from his social media accounts and television show. Some of Sparks' businesses sell vehicles as part of their business operations. Farm Bureau argues that the vehicle business exception applies to the Lunsford Incident because an employee of one of Sparks' entities borrowed the Polaris by relying on his association and employment in Sparks' business. Moreover, Farm Bureau argues that "[g]iven the frequency of David Sparks' advertisement and endorsement of Polaris' products via his social media accounts, the Ranger is excluded from coverage because it falls under the 'Vehicle Business' exclusion." ECF No. 76 at 33.

Farm Bureau attempts to stretch the vehicle business exclusion too far. First, the mere fact that Sparks advertises Polaris products cannot render every Polaris vehicle he owns for personal purposes uninsurable. Moreover, the record clearly demonstrates that, although Perkins was employed by one of Sparks' businesses, Perkins borrowed the Ranger purely for a personal activity. There is no evidence that Perkins engaged in any "business," even tangentially, while on the church outing. Nor is there evidence that using a vehicle on a church outing qualified as part of Perkins' employment in Sparks' vehicle business. Farm Bureau produces no evidence that Perkins used the opportunity to promote the Ranger in the hopes that potential customers would buy the vehicle. There is simply no link between Sparks' businesses and Perkins' use of the Ranger at the time of the incident. Accordingly, the court finds that the vehicle business exclusion does not apply.

### ii.    Non-Owned Vehicle Exclusion

Farm Bureau states in a conclusory manner that the non-owned vehicle exclusion applies. The non-owned vehicle exclusion provides that "[t]here is no coverage for vehicles which are not 'your personal vehicles' that are owned by you or furnished or available for your regular or frequent use." ECF No. 69-9 at 31. While Farm Bureau does not elaborate its argument, presumably this argument is the mirror image of its central argument that Sparks does not "own" the Ranger. Just as whether Sparks owned the Ranger is a question of fact best suited for a trier of fact, whether the non-owned vehicle exception applies is similarly a fact issue to be resolved by a trier of fact. Accordingly, the non-owned vehicle exception cannot provide a basis for granting summary judgment in favor of Farm Bureau.

### iii.   Noncooperation[8]

Finally, the Policy "requires [the insured's] cooperation with the handling of the claims made against you."  ECF No. 66-10 at 4. Under Utah law, "[a]n insurer seeking to avoid coverage of a claim for reasons of noncooperation must establish two things: (1) that it used 'reasonable diligence' to secure the insured's cooperation; and (2) that the noncooperation 'substantially prejudiced' its ability to defend against the claim in question." *Doctors' Co. v. Drezga*, 218 P.3d 598, 605 (Utah 2009). "The burden for demonstrating reasonable diligence and substantial prejudice rests on the insurance company." *Id.*

Farm Bureau rests its allegations of noncooperation on two arguments. First, the Policy requires insureds to give "[p]rompt notice of a loss of claim to which this policy applies." ECF No. 69-9 at 16. The underlying incident occurred on July 11, 2019. While Sparks notified his agent of the incident, Farm Bureau states that it first received notice of the claim on February 19, 2020 when it received a copy of the underlying lawsuit. Farm Bureau argues that it was prejudiced by Sparks' seven-month delay in reporting the Lunsford Incident. But Farm Bureau has made no effort to adduce evidence that it was prejudiced by Sparks' failure to give notice of the claim. *See Transwest Credit Union v. CUMIS Ins. Soc., Inc.*, No. 2:09-cv-297, 2013 WL 1830810, at *2 (D. Utah Apr. 30, 2013) ("It is clear that late notice alone does not establish prejudice."). Indeed, "the record contains no evidence that [Farm Bureau] would have done anything differently had [Sparks] provided timely notice." *See B.S.C. Holding, Inc. v. Lexington Ins. Co.*, 559 F. App'x 663, 666 (10th Cir. 2014) (unpublished). And there is no evidence that Farm Bureau lost access to witnesses

---

[8] The arguments regarding noncooperation go to whether Farm Bureau owes coverage for the Lunsford Incident. Specifically, they fall under Farm Bureau's third cause of action where Farm Bureau requests that the court find that "there is no coverage for Dave Sparks under the Contract of Insurance for his failure to cooperate as required by the terms of the Contract of Insurance." ECF No. 2 ¶ 3.

or evidence or lost out on opportunities to settle because of the passage of time. *See Transwest*, 2013 WL 1830810, at *2 (holding that prejudice "occurs when an insurer suffers a material change in its ability to investigate, settle, or defend the claims at issue" (citing *F.D.I.C. v. Oldenburg*, 34 F.3d 1529, 1547 (10th Cir. 1994))).

Second, Farm Bureau's complaint alleges that "Farm Bureau has made several unsuccessful attempts to obtain and confirm ownership of the vehicle involved in the Accident." ECF No. 2 ¶ 54. In essence, Farm Bureau appears to argue that Sparks failed to cooperate in demonstrating that he owned the Ranger. But, of course, whether Sparks has sufficiently established that he owns the Ranger goes to the heart of this case. Sparks maintains that the MSO he produced to Farm Bureau as well as the information he supplied to his Farm Bureau agent, Beus, during the underwriting process, sufficiently establishes his ownership of the Ranger. Farm Bureau disagrees. As the court has already recognized, this is a dispute best resolved by the trier of fact.

In sum, Farm Bureau has failed to produce any concrete evidence demonstrating that Sparks' delay in notifying Farm Bureau of the claim prejudiced Farm Bureau in its ability to defend against the Lunsford Incident claim. Moreover, Farm Bureau's contention that Sparks' failure to produce evidence of ownership constitutes noncooperation merely highlights the different positions taken by the parties on what evidence properly demonstrates ownership. Accordingly, the court cannot grant summary judgment on Farm Bureau's noncooperation claim.

*               *               *

In sum, the court finds that there is a genuine issue of material fact as to the ownership of the Ranger at the time of the Lunsford Incident. Moreover, Farm Bureau has failed to establish the applicability of at least one of the policy exceptions. Accordingly, summary judgment in favor of

Farm Bureau is inappropriate because material issues of fact remain to be decided before coverage, or lack thereof, can be determined. However, Defendants raise two additional arguments as to why the court should grant summary judgment in their favor, even if a genuine issue of material fact as to ownership remains. The court now turns to those arguments.

## III.    ADDITIONAL ARGUMENTS BY DEFENDANTS

First, Defendants argue that they are entitled to summary judgment because the Policy was in effect on the date of the Lunsford Incident. Second, Defendants argue that Farm Bureau's acceptance of premiums establishes coverage.

### A.    *An Effective Policy Does Not Per Se Establish Coverage*

As an initial matter, Defendants argue that they are entitled to summary judgment because the Lunsford Incident occurred on July 11, 2019, well before Farm Bureau's cancellation took effect on August 20, 2019. But the existence of the Policy at the time of the accident does not, in itself, guarantee coverage under the Policy.

No party disputes that the Policy was in effect during the Lunsford Incident. *See* ECF No. 69-8 at 19 ("The policy was in force, but I cannot answer as to whether coverage."); *see also* ECF No. 66-9 at 3 ("All I know is that [the policy's] in force up until the policy date. There's other factors that I'm not involved in in determining coverage."). Rather, the question here is whether Farm Bureau owes coverage for the Lunsford Incident. And coverage is a separate issue from whether the policy was in effect. Farm Bureau is not required to rescind or revoke a policy in order to deny coverage because an insured failed to meet the Policy requirements.

### B.    *Sparks' Payment of Premiums Does Not Require a Ruling in Sparks' Favor*

Defendants argue that *Continental Insurance Company v. Kingston*, 114 P.3d 1158 (Utah Ct. App. 2005), requires the court to grant summary judgment because Farm Bureau retained

Sparks' premiums prior to the August 2019 cancellation. Specifically, Defendants argue that "an insurer waives the right to rescind an insurance policy when that insurer has knowledge of the facts that would give it the right to rescind the policy, and does not act promptly to assert or reserve the right to rescind the policy, or otherwise treats the policy as valid, such as by earning and collecting premiums." ECF No. 81 at 9 (quoting *Cont'l*, 114 P.3d at 1162). Defendants argue that, just as the insurance company in *Continental*, Farm Bureau "continued to bill [Sparks] for premiums even after it discovered [the information that would give it the right to rescind the policy]." *Id.* (quoting *Cont'l*, 114 P.3d at 1164).

The parties do not dispute that Farm Bureau continued to collect premiums after the accident occurred. *See* ECF No. 81 at 10 ("[W]e collected premiums up until the cancelation date and any unused, unearned premium after that was refunded." (citation omitted)). But this case is distinguishable from *Continental*. In *Continental*, the insurer accepted premiums for months after the incident in question occurred and for months after the insurer had indisputable knowledge of the insured's misrepresentation regarding the age of the covered home. *Cont'l*, 114 P.3d at 1162. Here, because of the timing of the Lunsford Incident, Farm Bureau likely only collected premiums, at most, for the month of August after the accident occurred. But more importantly, when Farm Bureau collected those premiums (i.e., in July or August 2019), there is no evidence that Farm Bureau had definitive knowledge of the facts that would allegedly give it the right to rescind the policy. Indeed, Farm Bureau continued to investigate whether coverage applied through as late as March 17, 2020, when Farm Bureau stated that it "ha[d] requested a copy of the title and registration, to confirm ownership of the unit involved in the accident" and that, "[t]o date, this information has not been received." ECF No. 66-10 at 6. Because Farm Bureau was still in the process of investigating whether coverage applied here, Defendants cannot demonstrate that Farm

23

Bureau continued to collect premiums while it had knowledge of the facts that would give it the right to rescind the policy. Accordingly, *Continental* does not control.

Nevertheless, collecting premiums and then denying coverage across the board strikes the court as profoundly unjust. *See U.S. Fid. & Guar. Co. v. Sandt,* 854 P.2d 519, 525 (Utah 1993) (holding that an interpretation of an insurance policy under which the insurer would "never have to pay the full amount of the purchased coverage" would be "unconscionable"); *Williams v. First Colony Life Ins. Co.*, 593 P.2d 534, 537 (Utah 1979) ("[I]t is unfair for an insurer to collect a premium which purports to cover a period when in fact no such coverage exists."); *see also Carlson v. Hamilton*, 332 P.2d 989, 991 (Utah 1958) (describing an unconscionable contract as one in which "no decent, fair-minded person would view the ensuing result without being possessed of a profound sense of injustice"). At oral argument, both parties agreed that Farm Bureau never returned any premiums to Spark nor indicated any intent to return premiums in the future. And "[i]n general, purchasers of insurance ought not to be denied coverage for which they have paid premiums." *See State Farm Mut. Auto. Ins. Co. v. Green*, 89 P.3d 97, 106 (Utah 2003).

But where an insured obtains coverage based on an intentional misrepresentation, coverage is no longer required. *See* UTAH CODE § 31A-21-105(2) (misrepresentations only affect an insurer's obligation if "the insurer relies on it and it is either material or made with the intent to deceive" or "the fact misrepresented or falsely warranted contributes to the loss"); *Prudential Prop. & Cas. Ins. Co. v. Mardanlou*, 607 P.2d 290, 292 (Utah 1980) ("[T]he Court's findings and conclusions are consonant with Utah's pertinent statute, § 31-19-8 which in essence prevents recovery by an insured where misrepresentations, omissions, concealment of facts and incorrect statements by an applicant for insurance are fraudulent, material to acceptance of the risk, or, if the true facts had been known by the insurer, it would not have issued the policy." (*see also Berger*

24

*v. Minn. Mut. Life Ins. Co.*, 723 P.2d 388, 389 (Utah 1986) (noting that Utah Code § 31-19-8 was recodified at Utah Code § 31A-21-105 per the recodification of the Utah Insurance Code, effective July 1, 1986)); *see also Perkins v. Great-W. Life Assur. Co.*, 814 P.2d 1125, 1130 (Utah Ct. App. 1991) ("There is nothing to indicate that Great–West was unreasonable in relying on the representations regarding Mrs. Perkins' employment status, and it should not be estopped from denying Mr. Perkins' life insurance claim simply because it paid previous health benefit claims in reliance on false information.").

Accordingly, even if the factfinder determines at trial that Sparks did not, in fact, have ownership of the Ranger, Farm Bureau is not necessarily entitled to prevail. Should the factfinder determine that Sparks did not own the Ranger, the factfinder must also determine whether Sparks engaged in intentional misrepresentation or if, instead, Farm Bureau collected premiums based on Sparks' sincere representations and then refused to provide coverage in violation of public policy. If the factfinder determines that the latter scenario occurred, then Farm Bureau may still be liable for coverage because "considerations of public policy make it fundamentally unfair for an insurer to collect a premium while providing no coverage." *Long v. United Ben. Life Ins. Co.*, 507 P.2d 375, 378 (Utah 1973) (discussing the unfairness of failing to provide coverage where a premium was collected in the context of binding).

## CONCLUSION AND ORDER

In sum, while Sparks had an insurable interest in the Ranger, a genuine issue of material fact remains as to ownership of the Ranger at the time of the accident. Accordingly, the court DENIES summary judgment for Farm Bureau. The court also DENIES summary judgment for Defendants.

DATED August 2, 2022.

BY THE COURT

Jill N. Parrish
United States District Court Judge